Good morning, Your Honor. May it please the Court, Judge Sirica, Judge Rendell, Judge Smith, counsel. Question. Never asked Kurt Whiteford to join the conspiracy? Answer. No, I did not. Question. Never told him about the agreement that you entered into with Bloom, Bruce Hoffengartner by the pool? Answer. No, I did not. Would you pull up the mic? I'm sorry, Judge. That's great. Thanks. Judge, those quotations, or judges, those quotations are examples of a number of admissions and concessions by the lead star witnesses in the government's case against Colonel Whiteford where they acknowledged that he did not have knowledge as to what was going on and he was not aware that money was being stolen. Well, that, those specific questions and answers had to do with that meeting in Baghdad, the initial meeting. Isn't that correct? Are you contending that that is all we can look to to decide whether there was, whether they joined the agreement? I think this, the theory of case put forth by the government is essentially too prompt. There is the theory that there was this poolside meeting where the overarching conspiracy to steer contracts to fill Bloom was hatched. I don't think there's any denying that. I would suggest that that's the case. And the monetary arrangements. And the monetary arrangements, correct. And I suggest that Kurt Whiteford was not part of that as the record supports because he was not part of the contracting process. He was a chief of staff. He had a broad range of responsibilities and he dealt with a multitude of other issues throughout the day, seven days a week, into each evening. The second prong of the theory put forth by the government was essentially that these men and women were pigs at the trail. They were a group of people who had access to the vault at the CPA and they were dipping into it and taking money by the thousands and when you total it up by the millions. And if you look at what was happening, there are equally stark admissions by Bob Stein and Bruce Hoffengartner that Kurt Whiteford did not know that that was happening. Now, well, but what, we are of course reviewing determinations made in the district court by a jury essentially for reasonableness. Absolutely. So what your client didn't know or what didn't come to his attention is not as important for purposes of our review as what he did know. Now, Whiteford's a full bird colonel, right? Right. In charge of the operation. Right. And what we do know from this record is that there is testimony that he accepted certain gratuities, that he requested certain items of value, including a 350Z, if I recall. Did not accept that, never received that. There's an email about it. Requesting, yeah, there's an email that he knew Bloom gave to members of his office, certain valuable items, and I know that if I were the prosecutor arguing this case to a jury, I would have loved to have in my quiver the statement, I hope he gets away with it. Now, what would a reasonable jury make of all of that? And I think there's more, but I've just focused on what I can recall. Well, we have to look at intent because in terms of reasonableness, Kurt Whiteford had a counter story to that. He testified at length as to the facts and the circumstances of this case. He also put forth very plausible explanations for what happened, for example, with the watch. Bob Stein, by all accounts, was a pathological liar. He's a sick, sick, sick man who was playing people off of one another and admitted in the testimony that he played Kurt Whiteford. That was an exact quote. So when we look for intent and assess reasonableness in this case, we have to look to these statements and these concessions by Stein and Hofengarter that he didn't know what was going on because for these acts to have been corrupt acts, he had to know what was going on. He had to be part of it. Bob Stein came to him with a story, and it's a story that he acknowledged in part when I questioned him on cross-examination about the watches. At this point in time, he was passing himself off as a Delta Force operator. He used to walk around in black. Mike Gefeller, the brilliant head of South Central, had nicknames for him, calling him Carlos the Jackal and thought he was this man of great adventure and mystery. He had every one con. And he comes in and he tells Kurt Whiteford, I want you to have this. It's a Breitling emergency rescue watch. And it happens at a time, and he explained. I have wealthy friends back in the United States who want to support the troops, and they're giving this. They want us to have these things. And this happens at a point in time when it's published, and we as citizens back here in the U.S. were reading about it every day. Our troops were under-equipped, ill-equipped, lacked body armor, were dying when IEDs were exploding, and this man accepted this. And he admitted to the agent, Randy Gregory, that he hesitated when he took it. But he took it because Stein had this explanation. And this is this man of a decorated veteran, a man who we now know gave himself a silver star through forged documents in his file. But we do know that later he said, you know, I better get rid of the watch and the laptop before I become a target of the investigation. No, no. He said he wished he had when he was questioned. And if you look back at the testimony of Hoffengardner, Hoffengardner admits that he said to Whiteford something along the lines of, yeah, it was all a lie. That was Hoffengardner in response to Whiteford when these agents start showing up at their office in Virginia. So even in the spontaneous statement by Hoffengardner supports that notion. So when we go to the intent, Judge Smith, that you asked about before, and how we assess this for reasonableness, we have to look to these underlying circumstances and these underlying concessions by these gentlemen that removed Kurt Whiteford from knowing what was going on. Because then you have a full-birth colonel, as you said, who has gone, we know, to counsel Tom Doherty to seek advice on whether or not we can do these things. Is this okay? Can I even entertain this offer? Tom Doherty says no. Even Hoffengardner, when talking about the cars, goes to him and he says, is this okay? And Whiteford did an assessment. Well, he didn't think that he was dealing with him in a contracting relationship. I don't think he understood the context. And he did a legal assessment and he thought it was okay. So when we're talking about this, we're talking about intent. And when we're talking about the reasonableness, therefore, of what the jury concluded here and the district court concluded here, these concessions, these admissions by Stein and Hoffengardner that he didn't know they were stealing. They didn't know, Whiteford didn't know they were stealing cash. Whiteford didn't know about the poolside scheme. They revealed the truth. And in this mass, it was a two-month trial, as I know you know, where it was just overwhelming. And every day in the jury room, the jury sat there with giant rifles and the laptop computers and the watches sitting in front of them. Every day, eight hours a day. And these admissions. Hopefully not the grenade launchers. I think the grenade launcher was there, but it was in a container, Judge. So. Let me ask you about counsel, the consultation with counsel. That wasn't about the laptops or computers, was it? As I recall, he consulted counsel about whether he could enter into this different venture, this airline venture. You're absolutely correct. But that was the extent of consultation. Yes, absolutely correct. But I offer that as an example of the thought process that Kurt Whiteford was going through, because when the watch is offered to him, it's offered to him as something that's completely not corrupt. And also important in conjunction with that is the exchange where Bruce Hoffengardner testifies about when he got the watch. He said Stein just handed it to him. Said, here, you got this. I want you to have this. Or something along those lines. Not, here's the watch from Bloom. Here's the watch Bloom got us. There's no linking it to the contracts. So if we look at Whiteford's explanation, and we're assessing reasonableness here, and we're considering these other admissions that he's not part of the conspiracy, doesn't know about the conspiracy, doesn't know about the steering of contracts to Bloom. And the only example that the government gives that remotely links Whiteford to the scheme is the $500,000 for the police academy, which takes place before the scheme is even hatched. It removes Whiteford from what was happening. But he's obviously stuck in this morass. And that's where I suggest to your honors that the confusion arises from, and the reasonableness was lost. Anything else you want to tell us? I do not believe I have anything else. Okay. We'll have you back. Thank you, Mr. Schon. Schenker. Good morning. Morning. May it please the court, V.J. Schenker for the United States. Your honors, as the court requested, I will focus my comments on the issue of the sufficiency of the evidence as to Mr. Whiteford. Mr. Schenker, let's pretend even though we're reviewing a jury verdict that is already there, that you are arguing in opposition to a Rule 29 motion here. Tell me everything in the record at this point that would warrant sending the case to a jury. Certainly, your honor. And if I could, I would, for the court's convenience, break it down into certain subject matter categories. So let's start with the general notion of awarding contracts to Phil Bloom. There was testimony, and this was actually through Mr. Whiteford's own words after the conspiracy ended, that he himself thought it was, quote, unquote, unusual that Bloom was awarded all of the police academy contracts. And that he saw Stein give large amounts of money to Mr. Bloom, but he never inquired further. He said this to an investigator after the conspiracy ended. There was testimony that Whiteford gave Bloom an unusual level of access to the CPA compound. Non-military personnel having this level of access was simply unprecedented, and Mr. Whiteford gave Mr. Bloom that level of access. There was testimony that Mr. Whiteford was involved in the decision to break the police academy contract into multiple smaller contracts. Yeah, can you be more specific about that? Yes. That's an important point, it seems. There was testimony both by Mr. Stein and Mr. Hopkin-Gardner, and I can give the court the appellate, I'm sorry, the appendix sites. These are both in the Wheeler appendix, which is the full transcript, at pages 542 and 1297. That Mr. Whiteford, although there were other individuals involved in this ultimate decision to break the contracts down into smaller contracts, Mr. Whiteford was involved in it and was aware of the effect that it would have. In other words, the ability to make the decisions at CPA South Central and not obtain reviews. Without going to the Central. Right. Not have review by Baghdad. And so that's the issue of awarding contracts to Mr. Bloom. Now let's talk about the flip side of that quid pro quo, which was receiving things from Mr. Bloom. Stein actually testified that he told Mr. Whiteford, Colonel Whiteford, that Bloom had paid for the watch that he received. Now this was a $3,500 Breitling watch. There was testimony, but even aside from testimony, I think a jury can use its common sense, that military personnel are not receiving $3,500 watches on the up and up. And Mr. Whiteford, in fact, told investigators that he knew, and I used the words up and up purposefully, that he knew that it wasn't on the up and up to receive a $3,500 watch. Now the jury was entitled to hear his testimony and his testimony on his own behalf. That this was paid for by benevolent people in the United States, but the jury was also free to reject that. Second, there was testimony that he flew on a $7,000 first class ticket provided by Mr. Bloom. And Stein testified that he told Colonel Whiteford that Bloom had provided the ticket. And after the conspiracy ended, Mr. Whiteford, Colonel Whiteford, told the investigators that he did know that Bloom had provided this ticket and that it was wrong for him to take it. Now he denied saying that when he testified, but again, this was an issue for the jury. Moreover, the itinerary for that ticket said Bucharest on it. Now, Mr. Whiteford knew that he was required to go through proper military travel office procedures in order to obtain tickets. Somebody doesn't just hand you a ticket that says Bucharest on it, and there was plenty of testimony to support the finding that he knew that Mr. Bloom's company was based in Bucharest. In addition, Bloom actually testified at trial that he was providing bribes, including jewelry and airline tickets to Mr. Whiteford. The jury was entitled to consider that. Now let's turn to this Nissan 350Z, an expensive sports car. There was testimony, ample testimony, that Mr. Whiteford sent an email requesting this car right after he provided airline information to Mr. Bloom and that Colonel Whiteford at that point knew that Mr. Bloom had provided a car or offered to provide a car to Mr. Hopfengardner. Bloom testified that Hopfengardner had told Colonel Whiteford about his vehicle and Hopfengardner testified to the same effect. In fact, Hopfengardner had asked Colonel Whiteford if it would be improper for him to accept a vehicle from Mr. Bloom and Colonel Whiteford said no. Now whether or not Colonel Whiteford's answer to that question was in good faith or was correct or not, and obviously we would submit that it was incorrect, the point is that he knew that Hopfengardner was receiving this vehicle free, was not simply receiving a deal on it, as Colonel Whiteford later testified at trial. Later on, Colonel Whiteford expressed disappointment to Hopfengardner that his vehicle deal with Mr. Bloom had not gone through and he told Agent Gregory, one of the investigators, that he knew that Hopfengardner had received his car as a gift and that he, in turn, had asked Bloom for a vehicle. Now let's turn, as my colleague said, there were really, if you think about it, two prongs of this case. The second one was the theft of money from the CPA vault. And what did Mr. Colonel Whiteford have to do with that? Well, first of all, he was involved in the decision to make Stein the comptroller. Stein actually testified that Whiteford knew that Stein was taking money from the vault without authorization. As Judge Smith noted, Colonel Whiteford said, I hope he gets away with it when he learned that Bob Stein had taken $750,000 from the vault. Going back to airline tickets, this is a separate ticket from the $7,000 first class ticket that Bloom provided. Colonel Whiteford accepted a $10,000 bundle of cash from Bob Stein to pay for an airline ticket. There was testimony that the bundle of cash was banded in such a manner that made it obvious that it was from the CPA vault. There was also testimony that Colonel Whiteford, when he paid out the cash for the ticket, tried to hide the fact that he was paying out $10,000 in cash or $6,500 in cash from his fellow military members, and he never returned the remaining $3,500. The jury was also entitled to reasonably infer that a member of the military doesn't simply receive $10,000 to pay for a ticket at the airport without any proper paperwork, any forms, anything of that sort. There was testimony that Mr. Whiteford referred to the money used to pay for these gifts that he received, the watch, the laptop, other items, as budget dust. And he might have thought of it as budget dust, but budget dust was still money belonging to the CPA. He took this laptop computer outside of the normal procurement process. Again, no forms, no paperwork. Anyone who works in the government, and especially the military, knows that you have to fill out a lot of forms. I had to fill out a lot just to travel here today. You don't simply get handed a laptop computer in the military and then, to boot, take it home with you. There was testimony that on one of his trips home, he tried to give his wife some of this saying that this was stolen money. And finally, as one member of the panel, I believe it was Judge Smith, noted, after the investigation started, Colonel Whiteford, when he learned that Hopfengardner was being investigated, became very concerned. He went to his house in a hurry, and he said, and I believe the actual quote was, I should throw the watch and laptop off of a bridge to get rid of them. So this is some, I wouldn't say it's the complete totality, but it's a large portion of the testimony that the government presented in its direct case against Mr. Whiteford. And again, we would have to stand on that testimony, but I would submit that the jury was entitled to consider Mr. Whiteford's testimony on his own behalf in the defense case once he chose to testify. And his credibility was undermined, if I may give my own opinion on that, quite severely during his testimony. He testified that he tried to turn in his laptop computer before leaving Iraq, but in three opportunities, he never told investigators of that. He came up with that only at trial. He testified, and my colleague made the argument here, that this watch was needed for his safety in Iraq. But he admitted on cross-examination that no one else in his unit received such a watch except for him and Hopfengardner. And finally, he testified that his trip home on the $10,000 given to him by Bob Stein was due to an order to renew his deployment in the United States. And he testified that he met with two individuals in California. Well, on cross-examination, it came out that those two individuals were actually not located in California at the time he was home, and he was forced to admit on cross-examination, while I stand corrected, I must have been mistaken. The jury was entitled to take those  And if your honors have no further questions, the government will rest on its brief. Thank you. Good. Thank you very much, Mr. Schechter. Good. Mr. Schrock? Thank you. My response is essentially the same as I set forth in my reply brief. And I'd like to begin with the characterization by the government that they have put forth time and time again that Curtis Whiteford put Bob Stein in the comptroller's office. And the suggestion, the overt suggestion, was that he did it to facilitate these thefts. The testimony, the language was clever. When Stein testifies, he says, Wilkinson and Whiteford. But when you probe a little further, the second question is asked, or a third question is asked, he says, Wilkinson. And then it becomes Wilkinson and Whiteford approved of it after the fact. Stein goes to him and says, Wilkinson wants me to do this. What do you think? And he says, that's fine. And this is the war hero we're talking to at this point in time. It's another example of a fact put forth to support this conspiratorial notion with regard to Whiteford that simply wasn't reality. It's not a fact. Wilkinson put him there. Whiteford did not put Stein there to facilitate a crime. And that's the argument that pervaded all of the testimony in this case. The airline tickets, $10,000 in cash. The suggestion is that gets $10,000 in cash. And that's the proof that it's illegal. Everything was in cash. It was an all-cash enterprise. There's a picture in evidence. I don't recall if it's in our appendix. I don't think it is. With $52 million in cash across a giant table and all of them kind of standing there around it. That's how they operated. It was not illegal to fly commercial. Kurt Whiteford and Bruce Hoffman Gardner and other military officers flew to Iraq commercial on American Airlines. It was the trip back. Flying commercial was allowed for CPA business. The trip back, whether they want to call it a vacation or characterize it as something else. The trip back was during a leave. He did renew his orders. They were up at the six-month mark. Obviously, he was wrong about who he reported to. But he renewed his orders. He was also supposed to pick up weapons at Fort Bragg. But here's the key. What does he do? He flies back to Iraq. He came back with this money. That's CPA business. Therefore, it's not illegal. The flight home, they all flew commercial. Mike Gefeller flew commercial and a host of other individuals flew commercial. Yet, the argument is that Kurt Whiteford is criminal for doing this. The suggestion, the military doesn't receive $10,000 in cash. Military officers don't receive $10,000 in cash. He was working for the CPA. It was all cash. That's how they did everything. They doled out money by the tens of thousands of dollars on a daily basis. They would get in a car accident and hand $5,000 to a villager just to stop a mob from surrounding them and attacking them. This is how they operated on a daily basis. The computer. Kurt Whiteford obviously made a mistake with what he did with regard to the computer. But there's no evidence to suggest that it was an overt part of a bribery scheme. It was part of an equipment order. He got one and there were two other individuals that got one. I forget the name of the third individual who wasn't even remotely alleged to have been part of the conspiracy. Jabari something. I don't recall his name. But he got one. Was Whiteford wrong to bring it home? There's no doubt about it. He had an explanation for it and he should have turned it in when he returned to the United States. I can't dispute that fact. But he had an explanation that it had classified documents on it. I've spoken of the watch, the ticket home, the car. I reiterate that to assess the email about the car, it was an inquiry. His email was he was inquiring about the car at the urging of Broussard and Gardner. And in assessing that car email, you have to look at these other admissions that he didn't know about the contracting. And finally, the $500,000 contract issue with the police academy that counsel for the government opened up with, by all accounts, took place before the conspiracy was ever hatched. Thank you very much. Good. Thank you, Mr. Shroth. Any further questions? Good. The case was extremely well argued and briefing is excellent as well. We thank counsel. We will take the matter under advisement.